1

2

3

4

5

6

7

8

9

10

11

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

12

13

14

15

16

17

Frank Rehder,

              Plaintiff,

    v.

Tanya Rehder,

              Defendant.

CASE NO. C14-1242RAJ

ORDER

18

19

20

21

22

23

24

25

26

27

**I. INTRODUCTION**

      This matter comes before the court on Frank Rehder's petition for return of his son, ARDR, to Germany. Dkt. # 1. He brings his petition under the Hague Convention on the Civil Aspects of International Child Abduction. He alleges that, Tanya Rehder, an American citizen and the mother of his son, wrongfully removed the child from Germany and brought him to Bellingham, Washington. The court conducted hearings in this matter on October 17, 2014, November 7, 2014 and December 3, 2014 and has received and reviewed hundreds of pages of declarations from both parties. For the reasons set forth below, the court GRANTS the petition and orders the return of ARDR to Germany.

ORDER- 1

## II. BACKGROUND

This case arises from a troubled relationship between the parents of the child at issue.  Frank Rehder and Tanya Rehder met in England in 2007.  Dkt. # 27, ¶ 3.  Shortly after they started dating, Frank informed Tanya that in 2003 he had entered into an illegitimate marriage with a woman named Shuang Mu.  *Id.*; Dkt. # 27-2, p. 8.  Although still married to Shuang, he assured Tanya that he was in the process of obtaining a divorce.  Dkt. # 27, ¶ 3.  As their relationship grew closer, Frank asked Tanya to move into the apartment next door to the apartment that he shared with Shuang.  Dkt. # 27, ¶ 4.  Tanya agreed and moved in at some point in November 2007.  *Id.*  Although Tanya's move did not go over well with Shuang, the parties carried on with this living arrangement through April of 2008.  *Id.*

At that time, Tanya decided to move to New York City to attend acting school.  *Id.*  Frank followed her there in May of 2008.  Dkt. # 27, ¶ 5.  Frank showed Tanya what he represented to be divorce papers evidencing the end of his marriage to Shuang.  *Id.*  Frank then proposed to Tanya and they married in New York City on May 19, 2008.  *Id.*

In February 2009, Frank and Tanya moved back to England.  Dkt. # 27, ¶ 6.  Both parties concede that they argued frequently – indeed, neither one has claimed that they experienced significant periods of contentment during their marriage.  Dkt. # 27, ¶ 6.  Despite their discord, they conceived a child and decided to continue living and working together in England through August 2010.  *Id.*  One month prior to the birth of their child, the couple moved to Leer, Germany to live with Frank's mother.  Dkt. # 27, ¶ 7.  Their son, ARDR, was born on September 10, 2010 in Germany.  *Id.*; Dkt. #1, ¶ 11.

ARDR lived in Germany from the date of his birth until he was removed by his mother to Bellingham, Washington.  Neither party has described the years in Germany leading up to Tanya and ARDR's departure, but it is clear that just before they left, Frank and Tanya's relationship had become increasingly strained.  On July 13, 2013, in a heated exchange over Google Chat, Frank had told Tanya to "use my card and f---ing go to

1   America and never come back." Dkt. # 27-2, pp. 49-50.  A few days later, on July 18,

2   2013, he had sent her an email stating "Please respect that I will no further contact

3   anymore.  If [ARDR] will get older he will find a letter at my moms house why I cannot

4   re-live [my other son's] story again in my life and decided this way.  I will care for him,

5   but it better ends with a big pain than keeps going on with pain and no end."  The email

6   goes on to discuss Frank's poor health and the allocation of insurance money in the event

7   of his death.  Dkt. # 27-2, p. 63.

8          About a month after these communications, on August 19, 2013, Tanya and

9   ARDR boarded a plane headed for Bellingham, Washington.  Dkt. #27, ¶ 13.  Frank had

10  knowledge of their departure.  He gave Tanya permission to use his credit card to

11  purchase the tickets and he drove her and the child to the airport.  Dkt. # 27, ¶ 19; Dkt. #

12  27-2, p. 48.  The parties dispute whether this was a permanent move: Tanya claims that it

13  was permanent and Frank consented to it, while Frank claims it was a "relationship

14  break" and that he allowed his son to go with his mother temporarily, until he and Tanya

15  could work things out.

16         After arriving in Washington, in September 2013, the child began attending school

17  and also began receiving health benefits.  Dkt. # 27-2, p. 86, 124.  Tanya informed the

18  school that she and the child had planned to return to Germany for three weeks in

19  November 2013, but that they would come back to Washington in December.  Dkt. # 25-

20  2, p. 21-22.  Tanya also informed the school that Frank eventually planned to join them in

21  Washington.  *Id.*; Dkt. # 25-2, p. 29.

22         Emails exchanged between Tanya and Frank show that Tanya wished to stay in

23  Washington, but that the couple was trying to work on their relationship.  Dkt. #27-2, pp.

24  100-09.  In October 2013, the couple applied for and began receiving benefits for their

25  child from the German government.  Dkt. # 27-2, p. 109.  In connection with this

26  application, Tanya indicated to the German government that she was at least a part-time

27  resident of Germany.  Dkt. # 7-6, pp. 26, 49, 65 (multiple documents evidencing

1  residence in Germany).  On November 16, 2013, Tanya and the child returned to

2  Germany.  Dkt. # 27-2, p. 59.  They stayed with Frank and it appears that the couple

3  mended their relationship during this period.  Dkt. # 27-2, p. 113; Dkt. # 25-2, p. 29.  On

4  December 5, 2013, Tanya and the child returned to Washington.  Dkt. #27-2, p. 54.  On

5  December 11, 2013, Tanya emailed Frank and stated "I do love and care for you and miss

6  you and do feel it's right to move forward together."  She also indicated that she was

7  looking into IT jobs and gyms for him here in Washington.  Dkt. # 25-2, p. 14.  On

8  December 16, 2013, Tanya emailed Frank again and stated "I do want to be together with

9  you…I do also miss you and love you very much" and that their son "misses you tons."

10  Dkt. # 25-2, p. 13.  She also advised the child's school that "things went really well in

11  Germany," that Frank planned to join them in Washington, and that she and the child

12  might be traveling again to Europe in February or March of 2014.  Dkt. # 25-2, pp. 29,

13  39.

14       Frank flew to Washington on December 31, 2013.  He stayed with Tanya and their

15  child until January 11, 2014.  Dkt. 27, ¶ 25.  During this trip, Frank signed a form that

16  allowed Tanya to travel with their child between Washington and Canada.  Dkt. # 27-2,

17  p. 149.  After returning to Germany, Frank continued to engage in Skype calls with

18  Tanya and his son.  Dkt. # 27-2, p. 111.  However, towards the end of January 2014, the

19  couple's relationship soured yet again.  It became clear that Frank would not be joining

20  them in Washington and that Tanya had no intent of returning to Germany or returning

21  their child to Germany.  Dkt. # 25-2, p. 24.  On February 5, 2014, Frank sent an email to

22  the child's school informing the administration that he has shared custody and that his

23  child was being wrongfully retained by Tanya in the United States.  Dkt. # 25-2, p. 25.

24  On February 19, 2014, Frank emailed Tanya and expressly stated that he never consented

25  to their son staying in Washington permanently.  Dkt. # 38, p. 8.

26       In March, 2014, Frank attended a parent-teacher conference call relating to his

27  son's schooling.  Dkt. # 25-2, p. 22.  On April 8, 2014, Frank attempted to visit his son in

1  Washington, but was stopped at the Canadian border.  The border police contacted Tanya

2  and she claimed that Frank was abusive.  Dkt. # 27, ¶ 37.  On May 16, 2014, Tanya filed

3  a petition for invalidity of marriage in Whatcom County and as part of that case sought a

4  custody determination regarding ARDR.  Case No. 14-3-00373-1.[1]  Tanya made no

5  mention of abuse of any kind in that petition.  Dkt. # 25-2, p. 70.

6        On May 27, 2014, the United States Central Authority sent a letter to the Whatcom

7  County court advising that Frank had initiated proceedings under the Hague convention

8  and that the state court should not issue a custody determination until the Hague issues

9  were resolved.  Dkt. # 27-2, p. 41.  On August 13, 2014, Frank filed his Hague petition

10 with this court.   Dkt. # 1.

11        As part of the proceedings in this matter, this court allowed Frank limited

12 visitation with his son.  Dkt. # 14.  Frank came to the United States to appear in-person at

13 the November 7th hearing before this court and during that time visited with his son over

14 the course of several days.  The visitation was completed without incident.  At no time

15 during these multiple hearings did Tanya Rehder voice any concerns regarding any

16 alleged abuse of the child by Frank Rehder.

17        Additionally, Frank submitted several third-party declarations describing his

18 relationship with his son.  Ms. Amber Holly Chin Owen stated that the relationship

19 between Frank and his son was "caring, committed and completely loving – the bond

20 between Mr. Rehder and his sons was evident and strong."  Dkt. # 7-2, p. 3.  Frank's

21 mother, whom the couple had lived with, stated "ARDR was very attached to my son.

22 Depending on the time that had my son, they were always together, have done a lot

23 together."  Dkt. # 7-3, p. 3.  Frank's former partner and the mother of his other son, Ms.

24 Simon Hodtke, stated that Frank "is intend to do the best for his child, always" and that

25 _____

26     [1] The court takes judicial notice of the existence of the state court proceedings,
available at: http://documents.whatcomcounty.us/weblink8/CustomSearch.aspx?

27 SearchName=SCCaseSearch.

1    he has made significant efforts to visit with his children and remain part of their lives.

2    Dkt. # 7-5, p. 3.  Ms. Hodtke also stated that Frank never exhibited abusive behavior

3    toward her or their child and that any accusations in this regard were shocking to her.

4    Dkt. # 25-2, p. 68.

5    **III. ANALYSIS**

6        The Hague Convention on the Civil Aspects of International Child Abduction,

7    Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (the "Hague Convention" or the

8    "Convention"), was adopted in 1980 by the Fourteenth Session of the Hague Conference

9    on Private International Law.  The Convention's goal is "to secure the prompt return of

10    children wrongfully removed to or retained in any Contracting State; and ... to ensure that

11    rights of custody and of access under the law of one Contracting State are effectively

12    respected in the other Contracting States."  Hague Convention, Art. 1.  Both the United

13    States and Germany are signatories to the Convention.  U.S. Department of State, Bureau

14    of Consular Affairs, Hague Abduction Convention Country List, http://travel.state.gov

15    /content/childabduction/english/country/hague-party-countries.html (last visited

16    December 8, 2014).  The United States implemented the Convention through the

17    enactment of the International Child Abduction Remedies Act (ICARA) (codified as

18    amended at 22 U.S.C. §§ 9001-9011 ).

19        In drafting the Convention's provisions, the Conference attempted to address a

20    particular type of "kidnapping" scenario: one in which a person, usually a parent,

21    removes a child to, or retains a child in, a country that is not the child's habitual residence

22    in order "to obtain a right of custody from the authorities of the country to which the

23    child has been taken."  Elisa Pérez–Vera, Hague Conference on Private International Law

24    428–29, ¶ 13 (1982) (hereinafter, "Pérez–Vera Report ").[2]  The Convention seeks to

25

26        [2]  The explanatory report of Elisa Perez-Vera, the official Hague Conference

27    reporter, is "recognized by the Conference as the official history and commentary on the

1  eliminate the motivation for such actions by requiring the court of the "requested State,"

2  or the country to which the child has been removed, to return a wrongfully removed or

3  retained child to his or her country of habitual residence, unless the removing party

4  establishes an exception or defense to return.  Hague Convention, Art. 12.

5        Unless and until there is a determination that the child need not be returned, "the

6  judicial or administrative authorities of the Contracting State to which the child has been

7  removed or in which it has been retained *shall not decide on the merits of rights of*

8  *custody*."  *Id.* Art. 16.  "[T]he Convention rests implicitly upon the principle that any

9  debate on the merits of the question, i.e. of custody rights, should take place before the

10  competent authorities in the State where the child had its habitual residence prior to its

11  removal ...."  Pérez–Vera Report at 430, ¶ 19.

12        The key operative concept of the Convention is that of "wrongful" removal or

13  retention.  The removal or the retention of a child is to be considered wrongful where:

14

15        a)  it is in breach of rights of custody attributed to a person,
            an institution or any other body, either jointly or alone,

16            under the law of the State in which the child was
            habitually resident immediately before the removal or

17            retention; and

18

19        b)  at the time of removal or retention those rights were
            actually exercised, either jointly or alone, or would have
            been so exercised but for the removal or retention.

20

21  Convention, Art. 3.

        In the event that a petitioning party shows that the child was wrongfully removed

22  or retained, Article 13 provides certain exceptions to the mandate that the child be

23

24  _____

25  Convention and is a source of background on the meaning of the provisions of the
   Convention available to all States becoming parties to it."  Hague International Child

26  Abduction Convention, Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (Mar. 26,

27  1986).

1   returned to his or her habitual residence.  Article 13(a) provides that the requested state is

2   not bound to order the return of the child when the petitioner "was not actually exercising

3   the custody rights at the time of removal or retention, or had consented to or subsequently

4   acquiesced in the removal or retention."  Additionally, Article 13(b) contains an

5   exception to mandatory return when "there is a grave risk that [the child's] return would

6   expose the child to physical or psychological harm or otherwise place the child in an

7   intolerable situation."

8         Although these exceptions or defenses are available, numerous interpretations of

9   the Convention caution that courts must narrowly interpret the exceptions lest they

10  swallow the rule of return.  *See Friedrich v. Friedrich (Friedrich II)*, 78 F.3d 1060, 1067

11  (6th Cir. 1996) ("A federal court retains, and should use when appropriate, the discretion

12  to return a child, despite the existence of a defense, if return would further the aims of the

13  Convention.").  In her report on the Convention, Pérez–Vera observed that "a systematic

14  invocation of the exceptions, substituting the forum chosen by the abductor for that of the

15  child's habitual residence, would lead to the collapse of the whole structure of the

16  Convention by depriving it of the spirit of mutual confidence which is its inspiration."

17  Pérez–Vera Report at 435, ¶ 34.[3]  Expressing similar concerns, the U.S. State Department

18  has noted that "[i]n drafting Articles 13 and 20, the representatives of countries

19  participating in negotiations on the Convention were aware that any exceptions had to be

20  drawn very narrowly lest their application undermine the express purposes of the

21  Convention-to effect the prompt return of abducted children."  Hague International Child

22  Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10509.

23

---

24        [3] *See, e.g.*, Hague International Child Abduction Convention; Text and Legal
25  Analysis, 51 Fed. Reg. at 10509 ("Importantly, a finding that one or more of the
    exceptions provided by Articles 13 and 20 are applicable does not make refusal of a
26  return order mandatory. The courts retain the discretion to order the child returned even if
27  they consider that one or more of the exceptions applies.").

ORDER- 8

1    With this framework in mind, we turn to the merits of Frank Rehder's petition for

2 the return of ARDR to Germany.

3 **A.  Habitual Residence.**

4       1.  <u>Germany was the child's habitual residence.</u>

5       The term "habitual residence" was intentionally left undefined in the Convention.

6 *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004).  To avoid formalistic

7 determinations, the Conference found that the question of whether a person is or is not

8 habitually resident in a specified country is a question of fact to be decided by reference

9 to all the circumstances of any particular case.  *Id.*  Nevertheless, if a child is born where

10 the parents have their habitual residence, the child normally should be regarded as a

11 habitual resident of that country.  *Id.* at 1020; *see also Friedrich v. Friedrich*, 983 F.2d

12 1396, 1402 (6th Cir. 1993) ("This is a simple case.  Thomas was born in Germany and

13 resided exclusively in Germany until his mother removed him to the United

14 States….therefore we hold that Thomas was a habitual resident of Germany…").

15       Here, ARDR was born in Germany, his father's native country, and lived there

16 from the date of his birth, September 10, 2010, until at least August 2013.[4]  His day-to-

17 day activities for the majority of his life, therefore, occurred in Germany, not the United

18 States.  Accordingly, the court finds that ARDR was habitually resident in Germany.

19       2.  <u>The child's father did not consent to a change in habitual residence.</u>

20       Tanya argues that Frank consented to or acquiesced in a change of the child's

21 habitual residence to the United States.  The court disagrees.  Where a child already has a

22 well-established habitual residence, simple consent to his presence in another forum is

23 not usually enough to shift it there.  *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir.

24

25 ─────────────────────

26       [4] Although the court finds that this was the date of the child's initial physical
removal from Germany, as explained herein the court does not find that this was the date

27 of the wrongful retention by Tanya Rehder.

2001).  Rather, the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration.  *Id.*

Although Frank made statements such as "use my card and f---ing go to America and never come back" and "please respect that I will no further contact anymore," it appears that these statements were made in fits of anger and not meant literally.  Based upon the court's review of the parties' multiple email communications, Google chats and personal declarations, both mother and father appear to have a penchant for the dramatic.  More importantly, the parties' *conduct* reveals that there was no mutual settled intent to abandon Germany as the child's habitual residence.  The parties continued to communicate after Tanya and the child's initial departure to Washington in August 2013 and they appeared to be working on their relationship.  Although the child started school in Washington and began receiving health benefits here, he also began receiving benefits in Germany as well.  Indeed, he was registered as at least a part-time German resident until May 2014.  Tanya and the child returned to Germany in November 2013 and stayed with Frank for three weeks.  Frank then visited them in Washington the following month.  The extensive communications between the mother and father, as well as communications with the child's school, reveal that there was some question as to whether ARDR would withdraw from school and return to Europe or whether Frank would attempt to join them here in Washington.  *See* Dkt. # 25-2, p. 39.

It was not until late January 2014, that it became clear that Tanya intended to stay here indefinitely and that she intended to keep her son here as well.[5]  Thus, the court

---

[5] Additionally, although the United States is Tanya's native country, there is insufficient evidence that Frank consented in August 2013 to ARDR remaining here on an open-ended basis.  *Compare Mozes*, 239 F.3d at 1082.  Rather, the evidence suggests that the parties were working on their relationship and that they would possibly settle – together – either in Washington, Germany or the UK.  Dkt. # 25-2, p. 39.

1    finds that Frank did not consent to or acquiesce in a change in the child's habitual

2    residence.

3    **B.  The Existence of Frank Rehder's Custody Rights, the Exercise of Those Rights,**

4    **and the Date of the Wrongful Removal/Retention.**

5            Having determined that the child's habitual residence was Germany, the court

6    must next determine if Tanya's removal of the child from his habitual residence was

7    "wrongful" under the Convention.  As stated above, the removal or retention is

8    considered wrongful where:

9

10            a)  it is in breach of *rights of custody* attributed to a person,
                an institution or any other body, either jointly or alone,

11              under the law of the State in which the child was
                habitually resident immediately before the removal or

12              retention; and

13

14            b)  at the time of removal or retention *those rights were
                actually exercised*, either jointly or alone, or would have
                been so exercised but for the removal or retention.

15

16    Convention, Art. 3 (emphasis added).

17            1.   The Existence of Frank Rehder's Custody Rights.

18            The Convention requires this court to look to German law to determine whether

19    petitioner had and was exercising valid custody rights.  *Friedrich*, 983 F.2d at 1402.  To

20    establish a "right of custody" under German law, the petitioner must show that he was

21    married to the child's mother at the time of the child's birth.  *See* German Civil Code §

22    1626a.  Otherwise, he must meet one of the elements of the German Civil Code regarding

23    "parental custody of parents who are not married to one another" --

24

25    (1) Where the parents, at the date of the birth of the child, are not married to
         one another, they have joint parental custody (1) if they declare that they

26         wish to take parental custody jointly, (2) if they marry one another, (3) if

27         the family transfers joint parental custody to them.

(2) On application by a parent, the family court is to transfer parental custody or a part of parental custody to both parents jointly in accordance with subsection (1) no. 3 if the transfer is not inconsistent with the best interests of the child.  If the other parent fails to submit reasons which might be inconsistent with the transfer of joint parental custody, and if not such reasons are manifest, it is to be presumed that joint parental custody is not inconsistent with the best interests of the child.

(3) Apart from this the mother has parental custody.

German Civil Code § 1626a.

Here, Frank claims that he has shared custody based upon his marriage to Tanya at the time of ARDR's birth.  The evidence, however, suggests that this marriage was more than likely bigamous.  Although Frank showed Tanya papers which appeared to evidence a divorce from his first wife, Shuang Mu, those papers were never filed with the appropriate court. Dkt. #28-2, p. 8.  Under either New York law (the state in which the marriage was celebrated) or German law (the state of habitual residence), bigamous marriages are considered invalid.  *In re Wood's Estate*, 119 N.Y.S.2d 110, 113 (1953); German Civil Code § 1306.  Although the German Civil Code allows unmarried parents to share custody if they satisfy the elements listed above (e.g., if they subsequently marry one another or if they seek and obtain a custodial declaration), petitioner failed to present any evidence that he had satisfied any of these alternative methods of obtaining custody rights.

Because the evidence initially submitted to the court raised serious questions regarding the validity of the marriage between Tanya and Frank, and in turn, Frank's "rights of custody" under German law, the court directed the parties to agree upon a German law expert who could advise the court on this matter.  *See* Hague Convention, Art. 7 and 14 (acknowledging the court's ability to seek out expert opinion for assistance in determining the existence of custody rights under the law of the country of habitual

1    residence).  The parties agreed upon Dr. Bea Verschraegen and the court accepted her as

2    an expert witness for these proceedings.  Dr. Verschraegen is a professor at the

3    University of Vienna, specializing in Comparative Law, Private International Law and

4    Unified Law.  Dr. Verschraegen submitted a detailed expert report (Dkt. ## 45, 46) and

5    testified before this court at a telephonic hearing on December 3, 2014.

6          According to Dr. Verschraegen, German law treats a bigamous marriage as

7    effective until it is dissolved by a court decision.  Once it is dissolved, the effect is *ex*

8    *nunc* (i.e., moving forward).  Dkt. # 45, p. 4.  Dr. Verschraegen's opinion is that "German

9    law would therefore treat the 2nd marriage as an effective marriage.  The child would be

10   regarded as a legitimate child born within the marriage."  Dkt. # 45, p. 21.  Additionally,

11   Dr. Verschraegen stated that the invalidity of the marriage under New York law would

12   not impact her conclusion.  She explained that even if New York law considered

13   bigamous marriages as absolutely void *ab initio*, German law would still "*recognize and*

14   *give effect to such a marriage with regard to the child custody issue*, although the

15   marriage itself would be considered to be void *ab initio* (regarding the spouses)."  Dkt. #

16   46, p. 3.  The parties and the court questioned Dr. Verschraegan during the telephonic

17   hearing and she reiterated these conclusions.

18         Accordingly, based upon the opinion of Dr. Verschraegan, as well as the court's

19   review of the translated versions of the German Civil Code and the Articles relied upon

20   by Dr. Verschraegan, the court finds that Frank Rehder has "rights of custody" under

21   German law.

22         2.   The wrongful retention occurred in late January 2014.

23         Having determined that Frank had custody rights under German law, the court

24   must next determine if he was exercising those rights *at the time of* the alleged wrongful

25   retention/ removal.

26

27

ORDER- 13

1    Tanya argues that the physical removal of the child occurred on August 19, 2013

2  and that Frank consented to that removal.  Alternatively, if the court finds that the

3  wrongful removal/retention occurred at a later date, she argues that Frank acquiesced in

4  that removal/retention.  As evidence, she points to the form signed by Frank allowing her

5  to travel with their child across the border between Washington and Canada.  Tanya's

6  position is incorrect and her evidence does not support the finding she urges upon the

7  court.

8    Although a parent may consent to the physical removal of a child from their

9  habitual residence for a limited period of time, the date of physical removal is not

10  dispositive.  Rather, the court must look to the surrounding circumstances to determine

11  when the removal or retention became "wrongful."  *See, e.g.*, *Mozes*, 239 F.3d at 1070

12  (finding that although father consented to presence of children in a different forum for 15

13  months, mother's later request for sole custody in that forum caused her retention to

14  become "wrongful" under the Hague Convention).

15    Here, the evidence shows that Frank agreed to allow the child to reside in this

16  forum while he and Tanya worked on their relationship.  His signature on a form

17  allowing Tanya to travel with the child across the Canadian border does not change this

18  conclusion.  Indeed, the need for his permission suggests the opposite – that he had

19  custody rights and was exercising them.  The evidence shows that the parties had

20  discussed settling together in Washington, returning to Germany, or possibly settling in

21  the UK.  See Dkt. # 25-2, p. 39.  As long as these communications were ongoing,

22  Tanya's retention of ARDR in this forum was not "wrongful."  It became wrongful in late

23  January 2014, when she announced, in derogation of Frank's shared custody rights

24  (including his right to participate in decisions regarding the child's residence and

25  upbringing) that she would remain in Washington with ARDR.

26    Tanya's contention that Frank abandoned his custody rights also lacks merit.

27  *Friedrich II* held that if a person has valid custody rights to a child under the law of the

country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute *clear and unequivocal* abandonment of the child.  *Friedrich II*, 78 F.3d at 1066.  Once a court determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.  *Id.*  In justifying this approach, the *Friedrich II* court explained that "an American decision about the adequacy of one parent's exercise of custody rights is dangerously close to forbidden territory: the merits of the custody dispute.  The German court in this case is perfectly capable of taking into account Mr. Friedrich's behavior…and the German court presumably will tailor its custody order accordingly." *Id.* at 1065.

Here, the evidence does not show a "clear and unequivocal" abandonment of the child.  To the contrary, it appears that Frank Rehder has made efforts to maintain a relationship with his son and exercised his custody rights as soon as it became clear that Tanya intended to dissolve her relationship with Frank and to keep ARDR in Washington indefinitely.[6]  Dkt. # 25-2, p. 23-24.

## C. No Grave Risk of Harm

Although Tanya did not expressly raise the "grave risk of harm" exception to the Hague Convention in her response to the petition, she has made vague allegations

---

[6] Frank attempted Skype calls with his son while he was residing in Washington (Dkt. # 27-2, p. 111; Dkt. # 25-2, p. 32); Frank was kept in the loop regarding ARDR's schooling and participated in parent-teacher conferences (Dkt. # 25-2, pp. 21-22, 26, 34); third parties acknowledged the closeness of Frank and ARDR's relationship (Dkt. # 25-2, p. 23, 30; Dkt. # 7-2, p. 3; Dkt. # 7-3, p. 3, Dkt. # 7-5, p. 3); Frank expressly stated that he did not consent to ARDR's residence in Washington (Dkt. # 25-2, p. 25; Dkt. # 38, p. 8); Frank commenced Hague proceedings and challenged Tanya's petition for custody (Dkt. # 1; Dkt. # 27-2, p. 41); and Frank traveled to the United States, last-minute and at his own expense, to appear in-person at proceedings before this court and to visit with his child.

ORDER- 15

1   regarding abuse as part of these proceedings.  Because of these vague allegations, the

2   court will address this exception as part of its analysis.

3          United States courts have consistently recognized that, like the other exceptions to

4   return of a child under the Convention, Article 13(b)'s exception for grave risk should be

5   "narrowly drawn."  *In re Adan*, 437 F.3d 381, 395 (3d Cir. 2006); *Blondin v. Dubois*, 238

6   F.3d 153, 162 (2d Cir. 2001) (observing that "grave risk of harm" arises in "situations in

7   which the child faces a real risk of being hurt, physically or psychologically, as a result of

8   repatriation"); *see also* 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) ("This provision was

9   not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best

10  interests…The person opposing the child's return must show that the risk to the child is

11  grave, not merely serious.").

12         Here, no credible evidence of abuse has been submitted to the court.  In addition to

13  the third-party declarations attesting to Franks' good relationship with his child, the court

14  notes that the visitation ordered by the court was completed without incident or complaint

15  by either party.  Accordingly, respondent has not met her burden of proof and the "grave

16  risk of harm" exception does not apply.

17  **D.  Attorney's Fees**

18         Congress has provided that a court "ordering the return of a child" under the

19  Hague Convention shall award "necessary expenses incurred by or on behalf of the

20  petitioner ... unless the respondent establishes that such order would be clearly

21  inappropriate."  22 U.S.C. § 9007(b)(3).  Accordingly, petitioner may file a motion for

22  costs and fees and respondent may file objections or otherwise respond, as allowed by

23  applicable law.

24                              **IV. CONCLUSION**

25         The letter and spirit of the Convention obligate this court to respect Germany's

26  authority to resolve the underlying custody dispute to the same extent we rely upon

27

1  German courts to respect like custody decisions made by courts in the United States. *See*

2  Art. 1, 12, 16 and 19, Convention.  Tanya Rehder appears to be a caring and devoted

3  mother.  She is not foreclosed from pursuing the best interests of her child and her rights

4  to custody and visitation, but she is required to do so in Germany, the country of her

5  child's habitual residence.

6       For all the foregoing reasons, the court GRANTS the petition (Dkt. # 1).  The

7  child, ARDR, is ordered returned to Germany, either in the custody of petitioner or

8  respondent, or another mutually agreed-upon individual.  ARDR must be returned to

9  Germany on or before December 31, 2014.  If the parties agree on a later date, they may

10  file a joint stipulation with this court explaining the reasons for the delay and requesting a

11  reasonable extension of the return date.

12       Dated this 9th day of December, 2014.

The Honorable Richard A. Jones
United States District Judge

ORDER- 17