HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Frank Rehder,<br><br>            Plaintiff,<br><br>    v.<br>Tanya Rehder,<br><br>            Defendant. | CASE NO. C14-1242RAJ<br><br>ORDER |

## I. INTRODUCTION

This matter comes before the court on respondent Tanya Rehder's motion to stay proceedings pending appeal and for temporary restraining order. Dkt. # 51. Tanya is the mother of ARDR, a child who is the subject of a return order entered by this court pursuant to the Hague Convention on the Civil Aspects of International Child Abduction. Dkt. # 48. On December 15, 2014, Tanya filed a notice of appeal of that order and is seeking a stay pending a ruling by the Ninth Circuit. Dkt. # 49. For the reasons set forth below, the court DENIES her motion.

## II. BACKGROUND

The facts of this case have been fully summarized in previous orders. *See*, *e.g.*, Dkt. # 48. Although the court reviewed every single email, Google Chat conversation and declaration submitted in this case (which amounted to hundreds of pages), the court did not, for obvious practical reasons, include verbatim recitations of every piece of evidence in its order. Because the present motion focuses specifically on the "consent defense" and respondent has cited to specific pieces of evidence as critical to her arguments, the court has expanded its recitation of the facts to fully address the arguments made in this motion. These additional facts relate to the parties' pre and post-departure communications and conduct and are set forth in the timeline below:

- In May of 2008, petitioner, Frank Rehder, and respondent, Tanya Rehder, were married. Dkt. # 27, ¶ 5.
- A few years later, their son ARDR was born in Germany on September 10, 2010. Dkt. #1, ¶ 11.
- ARDR lived continuously in Germany until he was removed by his mother to Bellingham, Washington on August 19, 2013. Dkt. # 27, ¶ 13. Neither party has described the years in Germany leading up to Tanya and ARDR's departure, but it is clear that just before they left, Frank and Tanya's relationship had become increasingly strained.
- On July 13, 2013, in a heated exchange over Google Chat, Frank had told Tanya to "use my card and f---ing go to America and never come back." Dkt. # 27-2, p. 49. Tanya then responded "get focused on work – we obviously cannot focus on our relationship." *Id.*
- A few days later, on July 18, 2013, Frank sent Tanya an email stating "Please respect that I will no further contact anymore. If [ARDR] will get older he will find a letter at my moms house why I cannot re-live [my older son's] story again in my life and decided this way. I will care for him, but

it better ends with a big pain than keeps going on with pain and no end." The email goes on to discuss Frank's poor health and the allocation of insurance money in the event of his death. Dkt. # 27-2, p. 63.

- The following day, on July 19, 2013, Tanya sent Frank an email addressing various issues between the couple. Dkt. # 27-2, pp. 61-62. She stated that she planned to return to Germany in November for three weeks and that Frank could visit with his son at that time. She also stated that she would be "100% available" to help Frank with his move out of one or both flats, shared by the couple. She also expressed concern regarding Frank's health and implored him to seek treatment. She concluded the email by stating that she would not restrict access to ARDR and that she would be available by email or phone anytime. *Id.*

- The following day, on July 20, 2013, Frank responded to Tanya's email implying that he believed he was going to die. Dkt. # 27-2, p. 65. He stated, "when you receive the message of my death you have to act fast and use my cards to pull all the money to the pay pal account." He also stated, "I will not check private emails anymore and marked all you[r] email addresses as spam, so I won't see them anymore. I also blocked all you email addresses on my IBM account." He concluded the email with "[f]arewell Tanya, give my boy a last big hug from me as I will not see him anymore." *Id.*

- It is unclear exactly what happened between July 20, 2013 and August 19, 2013 (the date of Tanya and ARDR's initial departure from Germany), but it is obvious that despite the dramatic protestations noted above, the parties did indeed speak again after July 20th.

- On August 19, 2013, Frank drove Tanya and the child to the airport in Germany. Dkt. # 27, ¶ 19; Dkt. # 27-2, p. 48. The parties dispute whether

Case 2:14-cv-01242-RAJ   Document 56   Filed 12/19/14   Page 4 of 13

this was a permanent move: Tanya claims that it was permanent and Frank consented to it, while Frank claims it was a "relationship break" and that he allowed his son to go with his mother temporarily, until he and Tanya could work things out.

- After arriving in Washington, in September 2013, the child began attending school and also began receiving health benefits. Dkt. # 27-2, p. 86, 124.

- Just prior to the child's enrollment in school (presumably August or September 2013), Tanya informed the school that Frank eventually planned to join them in Washington. Dkt. # 25-2, pp. 21-22. Tanya also informed the school that she and the child had planned to return to Germany for three weeks in November 2013, but that they would come back to Washington in December. *Id.*

- On October 17, 2013, Frank sent Tanya an email, stating "Hi Tanya, thank you for the call tonight, we will have some difficult calls like we started because of all the blockage and unresolved, but I think after we hit the valley we will move up again." Dkt. # 27-2, p. 106. He also stated, "[ARDR] is like us very sensitive, but if we manage to find a way your visit in November will be all quality than all of us will benefit." *Id.*

- On October 17, 2013, Tanya responded to this email stating "I think it's extremely important we make this a special time for [ARDR] because that will force us to make this a special time for us (something we've never done before i.e. never taken a holiday, or a day off, or just had a commitment or focus to do nothing but having fun)." *Id.*

- Also on October 17, 2013, Frank sent Tanya an email stating, "Think revers[e], if [ARDR] would have stayed with me and would have went in Kindergarten in Germany while only speaking with his mother on the phone with the outlook to see his mother twice a year…..His Grandmother

ORDER- 4

and his Father he has build his first bonds in his very important first year, which is no longer available, is the absence of both over long period taking care of him without damaging him if you look at it long term?" Dkt. # 27-2, p. 103. He goes on to say "I am not talking about changing the situation, but also looking at the situation how it is and will be…Nothing is defined nothing must, but just think about what potential alternatives could be arranged." *Id.* at 1-3-04.

- On October 18, 2013, Tanya responded to this email stating, "as you know I've moved here and am staying here….the only option for a consistent basis would be for you guys to move to the area and live up the road." Dkt. # 27-2, p. 103.

- Frank responded to this email on October 18, 2013, stating "it's not always black and white Tanya, or Germany or the US…." Dkt. # 27-2, p. 103.

- During this time period, in October 2013, the couple applied for and began receiving benefits for their child from the German government. Dkt. # 27-2, p. 109. In connection with this application, Tanya indicated to the German government that she and the child were at least part-time residents of Germany. Dkt. # 7-6, pp. 26, 49, 65 (multiple documents evidencing residence in Germany).

- On November 16, 2013, Tanya and the child returned to Germany. Dkt. # 27-2, p. 59. They stayed with Frank and it appears that the couple mended their relationship during this period. Dkt. # 27-2, p. 113; Dkt. # 25-2, p. 29.

- On December 5, 2013, Tanya and the child returned to Washington. Dkt. #27-2, p. 54.

- On December 9, 2013, Tanya advised the child's school that "things went really well in Germany," that Frank planned to join them in Washington,

and that she and the child might be traveling again to Europe in February or March of 2014. Dkt. # 25-2, p. 29.

- On December 11, 2013, Tanya emailed Frank and stated "I do love and care for you and miss you and do feel it's right to move forward together." She also indicated that she was looking into IT jobs and gyms for him here in Washington. Dkt. # 25-2, p. 14.
- On December 16, 2013, Tanya emailed Frank again and stated "I do want to be together with you…I do also miss you and love you very much" and that their son "misses you tons." Dkt. # 25-2, p. 13.
- On December 17, 2013, Tanya emailed the school and stated, "I'm going to hold off on withdrawing [ARDR] at the moment from school. Frank found out today he didn't get the discovery channel gig which would have kept us in the UK so things are more flexible…am speaking to a lawyer about potential options of us applying for his visa in country." Dkt. # 25-2. P.39.
- On December 31, 2013, Frank flew from Germany to Washington. He stayed with Tanya and their child until January 11, 2014. Dkt. 27, ¶ 25.
- During this trip, Frank signed a form giving his consent for Tanya to travel with their child between Washington and Canada. Dkt. # 27-2, p. 149.
- After returning to Germany, Frank continued to engage in Skype calls with Tanya and his son. Dkt. # 27-2, p. 111. However, towards the end of January 2014, the couple's relationship soured yet again. It became clear that Frank would not be joining them in Washington and that Tanya had no intent of returning to Germany or returning their child to Germany. Dkt. # 25-2, p. 24.

- On February 5, 2014, Frank sent an email to the child's school informing the administration that he has shared custody and that his child was being wrongfully retained by Tanya in the United States. Dkt. # 25-2, p. 25.
- On February 19, 2014, Frank emailed Tanya and expressly stated that he never consented to their son staying in Washington permanently. Dkt. # 38, p. 8.

As the court stated in its previous order, based upon a review of all of the evidence, it is clear that both parties have a penchant for melodrama and express themselves with emotional over-the-top statements that do not correspond with their subsequent conduct.

### III. ANALYSIS

The Supreme Court has instructed lower courts to consider requests for stays of return orders on a case-by-case basis. *Chafin v. Chafin*, 133 S. Ct. 1017, 1027 (2013). The court cautioned against routinely granting stays of return orders because doing so might result in the child losing precious months when it could have been readjusting to life in its country of habitual residence, even though an appeal had little chance of success. *Id.* at 1027 ("If losing parents were effectively guaranteed a stay, it seems likely that more would appeal, a scenario that would undermine the goal of prompt return and the best interests of children who should in fact be returned.").

Accordingly, courts must apply the four traditional stay factors in considering whether to stay a return order: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.*

1. Likelihood of Success on the Merits

Respondent, Tanya Rehder, contends that she is likely to succeed on the merits "most especially on the defense of Frank's consent." Dkt. # 51, p. 4. Below the court will address the "consent defense" which refers to *ex ante* consent pre-removal, as well as Frank's alleged post-removal acquiescence. *See Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001) (acknowledging that courts should divide consent and acquiescence inquiries and analyze them separately).

The consent defense, like other affirmative defenses under the convention, must be narrowly construed.[1] "Even ambiguous statements or actions don't suffice; the Convention requires the parent opposing removal to 'unequivocally demonstrate that [the petitioning parent] consented to the child's indefinite stay in [America]'." *Cuellar v. Joyce*, 596, F3d. 505, 512 (9th Cir. 2010). Article 13(a) does not provide that if a parent consents to removal of the child for a period, under certain circumstances, that retention of the child beyond those conditions or circumstances is necessarily permissible. *Baxter v. Baxter*, 423 F.3d 363, 370-713 (3d Cir. 2005). Additionally, courts may look to the parties' post-removal conduct to determine whether petitioner gave his *ex ante* consent to removal. *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001) ("Of course, conduct after removal can be useful in determining whether consent was present at the time of removal.").

The defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of

---

[1] Additionally, finding the existence of an exception under Article 13 does not preclude an order of return. *See, e.g.*, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10509 ("Importantly, a finding that one or more of the exceptions provided by Articles 13 and 20 are applicable does not make refusal of a return order mandatory. The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

time." *Baxter*, 423 F.3d at 372 (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)). Courts have held the acquiescence inquiry turns on the *subjective intent* of the parent who is claimed to have acquiesced:

> Often, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute. The consent and acquiescence inquiries are similar, however, in their focus on the petitioner's subjective intent. In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.

*Baxter*, 423 F.3d at 371-72 (citations omitted).

In her motion, the respondent points to the communications recited above in which Frank stated, among other things, "Farewell Tanya, give my boy a last big hug from me as I will not see him anymore." Dkt. # 51, p. 4. Such statements, including "use my card and f---ing go to America and never come back," when read in context, and in light of the parties' melodramatic communication style, do not unequivocally demonstrate that Frank consented to his child's indefinite stay in America. Again, the court's conclusion is supported by the parties' post-removal conduct, which showed that the parents were continuing to work on their relationship and that they had discussed settling together in America, returning to Germany, or possibly settling in the UK:

- October 17, 2013 email from Frank to Tanya: "Hi Tanya, thank you for the call tonight, we will have some difficult calls like we started because of all the blockage and unresolved, but I think after we hit the valley we will move up again." Dkt. # 27-2, p. 106.

ORDER- 9

- October 17, 2013 email from Tanya to Frank: "I think it's extremely important we make this a special time for [ARDR] because that will force us to make this a special time for us…." *Id.*
- October 18, 2013 email from Frank to Tanya. In response to her statement that she is staying in America, he wrote "it's not always black and white Tanya, or Germany or the US…." Dkt. # 27-2, p. 103.
- December 9, 2013 email from Tanya to the child's school advising that "things went really well in Germany," that Frank planned to join them in Washington, and that she and the child might be traveling again to Europe in February or March of 2014. Dkt. # 25-2, p. 29.
- December 11, 2013 email from Tanya to Frank: "I do love and care for you and miss you and do feel it's right to move forward together." Dkt. # 25-2, p. 14.
- December 16, 2013 email from Tanya to Frank: "I do want to be together with you…I do also miss you and love you very much" and ARDR "misses you tons." Dkt. # 25-2, p. 13.
- December 17, 2013 email from Tanya to the child's school: "I'm going to hold off on <u>withdrawing</u> [ARDR] at the moment from school. Frank found out today he didn't get the discovery channel gig which <u>would have kept us in the UK</u> so things are more flexible…am speaking to a lawyer about potential options of us applying for his visa in country." Dkt. # 25-2. p. 39 (emphasis added).

Based upon the foregoing, the preponderance of the evidence demonstrates that the petitioner's consent to removal was conditional and intended for a limited period of time, while the parties continued to work on their relationship. Additionally, the court finds it significant that neither party commenced divorce proceedings at the time of removal.

ORDER- 10

The foregoing also demonstrates that petitioner did not acquiesce, post-removal, to the indefinite stay of his child in America. His emotional statements do not constitute "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Baxter*, 423 F.3d at 372.

The court notes respondent's concern that "Frank sought to portray the documents in a completely different light than their plain meaning" and that the court "heard only his direct testimony but denied Tanya the ability to testify or cross-examine Frank." Dkt. # 51, p. 5. At the hearing referenced by respondent, the court advised the parties that it found Frank's testimony to be unhelpful and repetitive of declarations he had already submitted. The court did not consider his testimony, cite to it, or rely on it in any way in its return order. The court gave both parties ample leeway to submit declarations, supplementary declarations and rebuttal declarations as well as documentary evidence (unrestricted by any page limits) and conducted multiple hearings in this matter in which both parties, who were represented by competent counsel, were given the opportunity to present evidence to support their positions. The court reached its conclusion based on this evidence and the arguments of counsel.

Based on the foregoing, the court finds that respondent is not likely to succeed on the merits.

2. Irreparable Injury

Respondent argues that she will suffer irreparable injury if a stay is not granted because she is ARDR's primary care provider, because Frank is in poor health and incapable of caring for the child, because she and the child currently live rent-free with her parents and have healthcare coverage, because ARDR does not speak German and because Tanya will be forced to uproot herself from Washington and return to Germany with ARDR. Dkt. # 51 pp. 6-7.

Unfortunately, under the Hague Convention, the court cannot overstep its mandate. *Cuellar*, 596 F.3d at 510. The court is prohibited from deciding whether Frank is a fit parent and where the child will be happiest. Such determinations impermissibly address the ultimate question of custody, which is a question for the German family court. *Id.*

It is entirely possible that a German family court may find that ARDR belongs with his mother and that it is in his best interests to reside in Washington. Respondent must, however, first obtain that custody determination in Germany before retaining ARDR in this jurisdiction. *See, e.g.*, *Cueller*, 596 F.3d at 510 ("The time to take such considerations into account is before undertaking the volitional acts that lead to conception. Once the child is born, the remote parent must accept the country where the child is habitually resident and its legal system as given.").

Although the court recognizes the burden faced by the mother in this matter, which involves uprooting herself, returning to Germany and seeking a custody determination from a German family court, it simply does not constitute irreparable injury.

3. Injury to Other Interested Persons

Respondent argues that a stay will not substantially injure the petitioner because it will merely maintain the status quo. Dkt. # 51 p. 8. The court disagrees. The petitioner has been living apart from his child since at least January 2014 and a stay will result in at least an additional four to six months of delay in the child's return to Germany. *See, e.g.*, *Chafin*, 133 S. Ct. at 1027 (cautioning that courts should not routinely grant stays because "doing so might result in the child losing precious months when it could have been readjusting to life in its country of habitual residence.").

4.  Public Interest

The Convention and ICARA demonstrate a public interest in expeditious resolution of petitions for return of children.  *Chafin*, 133 S. Ct. at 1027.  The argument that Tanya may face difficulty in retrieving ARDR if she wins her appeal has already been rejected by the Supreme Court.  *Id.* at 1025.

## IV. CONCLUSION

The pertinent factors weigh against a stay pending appeal of the order for return in this case and, accordingly, respondent's motion (Dkt. # 51) is DENIED.  Because neither party has advised the court of any travel arrangements made for the child and in light of the upcoming holidays, the court is going to continue the deadline for return of the child to January 12, 2015.  On or before January 5, 2015, the party accompanying the child to Germany shall file a notice of travel arrangements with the court and request release of the child's passports.

The court emphasizes that nothing in this order shall be construed as an order regarding the child's living arrangements in Germany.  Tanya Rehder is not prevented from accompanying her child to Germany and invoking her rights of custody under German law.

Dated this 19th day of December, 2014.

The Honorable Richard A. Jones
United States District Judge

ORDER- 13