1

2

3

4

5

6

7

8

9

10

11

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

12

13

14

15

16

17

18

Frank Rehder,

                        Plaintiff,

        v.

Tanya Rehder,

                        Defendant.

CASE NO. C14-1242RAJ

ORDER

19

## I. INTRODUCTION

20

21

22

23

24

25

26

27

        On December 9, 2014, this court entered an order granting Frank Rehder's petition for return of his son, ARDR, to Germany pursuant to the Hague Convention on the Civil Aspects of International Child Abduction.  Dkt. # 48.  The child's mother, Tanya Rehder, appealed the order to the Ninth Circuit and moved this court for an immediate stay pending resolution of the appeal.  Dkt. ## 49, 51.  The court denied her motion for a stay and the Ninth Circuit affirmed.  Dkt. # 56, 65.

ORDER- 1

1    Thereafter, Tanya accompanied ARDR back to Germany and sought custody from

2    a German family court.  Dkt. # 95.  At the conclusion of those proceedings, it appears

3    that the child's father consented to allow the mother to have sole decision-making

4    authority regarding the child's future place of residence.  *Id.*  Tanya chose Washington

5    State and has since returned here with ARDR.  *Id.*

6    The only matter remaining before this court is Frank's motion for attorney's fees

7    (Dkt. # 59).  For the reasons stated below, the court DENIES the motion.

8    ## II. BACKGROUND

9    The court has outlined the facts of this case in previous orders (Dkt. ## 48, 56).  In

10   short, ARDR's parents had a troubled relationship that began in 2007.  Dkt. # 27, ¶ 3.

11   Despite their discord, they conceived a child.  Dkt. # 27, ¶ 6.  One month prior to the

12   birth of their child, the couple moved to Germany.  Dkt. # 27, ¶ 7.  Their son, ARDR,

13   was born on September 10, 2010 in Germany.  *Id.*; Dkt. #1, ¶ 11.

14   ARDR lived in Germany from the date of his birth until he was removed by his

15   mother to Bellingham, Washington.  Neither party described the years in Germany

16   leading up to Tanya and ARDR's departure, but it is clear that just before they left, Frank

17   and Tanya's relationship had become increasingly strained.  Dkt. # 27-2, pp. 49-50.

18   The parties engaged in a series of emotional and volatile communications, just

19   before and just after Tanya and ARDR's departure.[1]  These communications included

20   statements by Frank such as "Please respect that I will [have] no further contact

21   anymore" (Dkt. # 27-2, p. 63) and "[U]se my card and f---ing go to America and never

22   come back."  Dkt. # 27-2, p. 49.

23   Although Tanya and the parties' son had moved to Washington, Tanya and Frank

24   continued to communicate and appeared to be working on their relationship.  Dkt. #27-2,

25

26   _____

[1] These communications are outlined in detail in the court's order denying the motion to

27   stay.  Dkt. # 56.

1  pp. 100-09; Dkt. # 25-2, pp. 13, 21-22, 29.  At one point they discussed Tanya moving

2  back to Germany, both parties moving to the United Kingdom, or Frank joining Tanya

3  and ARDR here in Washington.  Dkt. # 25-2, p. 39.

4      At some point in January of 2014, the couple's relationship soured yet again.  It

5  became clear that Frank would not be joining his family in Washington and that Tanya

6  had no intent of returning to Germany or returning their child to Germany.  Dkt. # 25-2,

7  p. 24.  In February 2014, Frank expressly stated on at least two separate occasions that he

8  never consented to ARDR staying in the United States indefinitely.  Dkt. # 25-2, p. 25;

9  Dkt. # 38, p. 8.

10     In May 2014, Tanya commenced divorce proceedings in Whatcom County.  Dkt. #

11  25-2, p. 70.  She also discovered that her marriage to Frank had been a bigamous one.  As

12  the record developed before this court, Frank confirmed that at the time he married Tanya

13  he was still legally married to a woman named Shuang Mu.  Dkt. #28-2, p. 8.  The status

14  of this previous marriage complicated the proceedings before this court and required the

15  intervention of a German law expert.  The expert advised the court regarding the impact

16  of the bigamous marriage on Frank's custody rights.  Dkt. # 48, pp. 11-13.[2]

17     After extensive briefing, multiple hearings, and consultation with the German law

18  expert, on December 9, 2014, the court granted Frank's petition and ordered ARDR's

19  return to Germany.  Dkt. # 48.

### III. ANALYSIS

21     Article 26 of the 1980 Hague Convention provides, in pertinent part, as

22  follows:

23          Upon ordering the return of a child or issuing an order
            concerning rights of access under this Convention, the

24

25

---

26     [2] As explained in the court's previous order, under German law, the mother has
   presumptive sole custody of the child unless: (1) the parents are married at the time of birth or

27  (2) if unmarried, the father obtains a declaration of custody.  Dkt. # 48, p. 13.

1
2
3
4

> judicial or administrative authorities may, <u>where appropriate</u>, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

5
6
7

The pertinent provision of ICARA, implementing the obligations of the United States under the 1980 Hague Convention, provides:

8
9
10
11
12

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title <u>shall</u> order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

13
14
15

42 U.S.C. § 11607(b)(3) (emphasis added); *see also Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995).

16
17
18
19
20
21
22
23

The First Circuit has explained that under §11607(b)(3), the district court "has a duty ... to order the payment of necessary expenses and legal fees, subject to a broad caveat denoted by the words, 'clearly inappropriate.' " *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004).[3] Such caveat provides the district court "broad discretion in its effort to comply with the Hague Convention consistently with our own laws and standards." *Id.*; *see also Chafin v. Chafin*, -- U.S. --, 133 S. Ct. 1017, 1022 (2013) (recognizing that under § 11607(b)(3), a court "generally" must require defendants to pay expenses, costs and fees associated with the return).

24

25
26
27

---

[3] Because the Ninth Circuit has issued only one decision regarding the standards for awards of fees under these provisions, the court has looked to the decisions of other Circuit Courts of Appeal to help inform its decision in this matter. *See, e.g.*, *Cuellar v. Joyce*, 603 F.3d 1142, 1143 (9th Cir. 2010).

1    An award of fees and costs is "appropriate" when the case is not a "difficult" one

2    and " 'falls squarely within the heartland of the Hague Convention.' "  *Cuellar v. Joyce*,

3    603 F.3d 1142, 1143 (9th Cir. 2010) (quoting its prior decision on the appeal of the

4    merits of the return in *Cuellar v. Joyce*, 596 F.3d 505, 511 (9th Cir. 2010).   On the other

5    hand, where the respondent had a "reasonable basis for thinking at the time of removing

6    the children to the United States ... that her actions were consistent with [the law of the

7    country of habitual residence]," that belief, even if mistaken, "is a relevant equitable

8    factor when considering whether a costs award is appropriate."  *Ozaltin v. Ozaltin*, 708

9    F.3d 355, 375 (2d Cir. 2013).

10    Also, "[a]t least two courts of appeals have recognized that a fee award in a case

11    under the Convention might be excessive and an abuse of discretion if it prevents the

12    respondent-parent from caring for the child."  *Norinder v. Fuentes*, 657 F.3d 526, 536 (2d

13    Cir. 2011) (citing *Whallon*, 356 F.3d at 139 and *Rydder*, 49 F.3d at 373-74).

14    Additionally, several district courts have not simply reduced awards of costs in light of a

15    respondent's inability to pay, but have declined to award costs at all.  *See, e.g.*, *Mendoza*

16    *v. Silva*, 987 F. Supp. 2d 910, 916-17 (N.D. Iowa 2014) (declining to award costs based

17    on complexity of case, equitable principles and respondent's inability to pay); *Lyon v.*

18    *Moreland-Lyon*, 2012 WL 5384558, at * 3 (D. Kan. Nov. 1, 2012) ("Given the

19    respondent's financial position, this court finds that awarding any of petitioner's

20    attorneys' fees against the respondent would be clearly inappropriate."); *Vale v. Avila*,

21    2008 WL 5273677, at * 2 (C.D. Ill. Dec. 17, 2008) (finding an award of any attorney's

22    fees "clearly inappropriate" because of the respondent's inability "to shoulder the burden

23    of the $115,872.26 in attorney fees, copying costs, etc. that Petitioner's counsel is

24    requesting," where respondent "has limited financial means and has found little gainful

25    employment in the United States," and, consequently, awarding the petitioner only his

26    "out-of-pocket costs").

27

ORDER- 5

1      Here, Frank seeks over $100,000 in attorneys' fees. Dkt. # 59. These fees include

2  $66,418.50 to Flexx Law, PS, his counsel in the United States, and $42,620.93 to other

3  attorneys who assisted Frank in Germany. *Id.*, p. 2. Although there is sufficient

4  evidentiary support for at least some portion of these claimed fees, after careful

5  consideration of equitable principles and pertinent factors in this case, *see Ozaltin*, 708

6  F.3d at 375 (recognizing that an award of fees and expenses under the Convention and

7  ICARA involves "equitable principles"), the court concludes that it is clearly

8  inappropriate to compel the child's mother to pay any of Frank's attorneys' fees.

9      First, this was not a simple case or one that fell "squarely within the heartland of

10 the Hague Convention," *see Cuellar*, 603 F.3d at 1143 (internal quotation marks and

11 citations omitted). The parties submitted hundreds of pages of briefing and appeared

12 before the court for a series of hearings. Additionally, under German law, a mother has

13 presumptive sole custody of the child unless the parents were married at the time of the

14 child's birth. Dkt. # 48, pp. 11-13. Here, there were serious questions regarding the

15 validity of the parties' marriage. *Id.* Because the parties' marriage was bigamous and

16 entered into in New York, the court was required to consult with a German law expert to

17 determine whether a German court would give effect to a void marriage entered into in a

18 different jurisdiction. *Id.* This significantly complicated the proceedings and required

19 the submission of an expert report along with additional briefing.   Dkt. ## 45, 46, 47.

20     Second, the court believes that Tanya had a mistaken, but nevertheless good faith

21 belief that the parties had agreed that she would take ARDR to the United States. *See*

22 *Ozaltin*, 708 F.3d at 375 (finding that a respondent's good faith belief, even if mistaken,

23 "is a relevant equitable factor when considering whether a costs award is appropriate.").

24 As the court outlined in its order denying the motion to stay, the parties engaged in

25 emotional and volatile back and forth conversations, in which Frank would tell Tanya to

26 leave and take the child with her, but immediately thereafter change his position and

27 claim that he wanted to work things out. Dkt. # 56. Although such back and forth is

1   insufficient to meet the Hague Convention's "unequivocal abandonment" standard, the

2   communications between the parties lead the court to believe that Tanya had a good faith

3   belief that Frank intended to allow their child to remain in the United States.  *See Cuellar*

4   *v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010) ("Even ambiguous statements or actions don't

5   suffice; the Convention requires the parent opposing removal to 'unequivocally

6   demonstrate that [the petitioning parent] consented to the child's indefinite stay in

7   [America]'.").

8          Finally, Tanya's financial circumstances make it "clearly inappropriate" to award

9   any amount of attorneys' fees against her.  Doing so would interfere with her ability to

10  provide support to the parties' son, ARDR.  *See Norinder*, 657 F.3d at 536; *Whallon*, 356

11  F.3d at 139; *Rydder*, 49 F.3d at 373-74.  Tanya had only $2,596.10 in her checking

12  account as of December 31, 2014 and her income tax returns show that she made very

13  little income.  Dkt. # 72-1, pp. 2-30, 51-79.  She has also presented evidence that her own

14  legal fees in this matter were paid for through a combination of loans from her family or

15  private high interest loans ranging from 12% to 18%.  *Id.*, pp. 37-40.  The record does

16  not show that she has any other assets from which so large a fee award could be satisfied.

17         Accordingly, the court declines to award fees against the child's mother.

18                                    **IV. CONCLUSION**

19         For all the foregoing reasons, the court DENIES the motion for attorneys' fees

20  (Dkt. # 59).

21         Dated this 31st day of July, 2015.

22

23

24                                             The Honorable Richard A. Jones
                                               United States District Judge
25

26

27

ORDER- 7